IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2020 Session

**IN RE NEVEAH A.**

**Appeal from the Juvenile Court for Hamblen County**
**No. J170060          Janice Hope Snider, Judge**

_____

**No. E2019-01628-COA-R3-PT**
_____

The trial court terminated a mother's parental rights to her child on the grounds of abandonment by failure to support, abandonment by failure to provide a suitable home, and substantial noncompliance with the permanency plan. The trial court terminated a father's parental rights to his child on the grounds of abandonment by failure to provide a suitable home and substantial noncompliance with the permanency plan. The trial court also found that termination of the mother's and father's parental rights was in the best interest of the child. Finding clear and convincing evidence in support of the trial court's determinations, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

W. Ellis Baltz, Morristown, Tennessee, for the appellant, Ashley P.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Gabriel A.

Herbert H. Slatery, III, Attorney General & Reporter, and Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.          BACKGROUND**

Neveah A. ("the Child") was born to Ashley P. ("Mother") and to Gabriel A. ("Father") in February 2014. Mother and Father have never been married to each other. On June 1, 2017, following a physical altercation between Mother and Father during

which the Child was bruised, she was removed from their home. The same day, upon the Department of Children's Services' ("DCS") contemporaneous petition, the trial court entered a protective custody order granting temporary legal custody of the Child to her maternal great aunt and uncle. Mother and Father agreed that probable cause sustained the Child's emergency removal and, accordingly, waived the preliminary hearing. Following Mother's and Father's stipulations,[1] on July 5, 2017, the court adjudicated the Child dependent and neglected and ordered temporary legal custody to remain with the Child's great aunt and uncle. Mother and Father were permitted supervised visitation.

Approximately one month later, the Child's great aunt and uncle asked to be relieved from their duties, citing Mother's aggressive behavior of cursing and yelling at them. By order entered August 9, 2017, the court awarded custody of the Child to DCS, who then placed her in a foster home.

On September 6, 2017, DCS developed a permanency plan with Mother and Father. It was ratified on February 12, 2018. Pursuant to the plan, Mother and Father were required to, among other things, set up child support payments; acquire stable housing and provide rent and utility receipts; follow Tennessee Early Intervention Services' recommendations and attend the Child's dental cleanings; obtain, maintain, and prove employment to DCS; provide proof of reliable transportation; provide proof of completing anger management courses; provide proof of completing domestic violence classes; submit to random drug screens, medication verification, and pill counts; resolve all legal issues and refrain from incurring new charges; and schedule and attend mental health assessments and follow all recommendations.[2]

DCS, primarily through Family Service Worker, Ms. Turner, reviewed the above requirements with the parents and tried to help them successfully complete the requirements. For instance, DCS helped Mother to schedule anger management, automatic positive thinking, parenting, and domestic violence classes. Ms. Turner tried to acquire home supplies for Mother, helped her schedule a mental health assessment, and tried to help her apply to Morristown Housing Authority. Mother refused this help because she did not want to "live in the projects." As for Father, his sporadic contact with DCS and failure to return messages impeded Ms. Turner's ability to help him. Seeing Father during court hearings was the most effective way DCS communicated with

---

[1] Mother stipulated that the facts DCS alleged in the petition were true, save Paragraph 10 which read as follows: "The child stated 'Daddy did it.' After talking with the child, she later disclosed that 'mommy and daddy hit me.'" Father stipulated that he and Mother engaged in a domestic altercation in front of the Child, that he spanked the Child, and left bruises on her.

[2] A second permanency plan was developed with the input of Mother, her counsel, Foster Parent, and DCS on May 10, 2018, and ratified on August 27, 2018. It reiterated the initial plan's requirements and added a requirement for Mother to schedule and complete an alcohol and drug assessment and follow all recommendations.

him. Nevertheless, DCS explained the permanency plan requirements to Father; offered to help with housing; accommodated his work schedule by arranging weekend visitation with the Child; told him where to complete assessments; and offered to pay for services.

At first, Mother cooperated and worked to complete the permanency plan requirements of anger management, parenting, and automatic positive thinking classes. At that time, Mother also maintained a safe and clean home suitable for the Child, a job at Waffle House, and appropriate regular visitation with the Child. Accordingly, Mother was granted a 90-day trial home placement with the Child beginning on February 12, 2018, while Father was permitted DCS-supervised visitation. During the trial placement, the Child stayed overnight with her maternal grandmother "quite a bit" because Mother's work ended late at night.

In March 2018, Ms. Turner smelled marijuana in Mother's home. Mother failed a drug screen for marijuana the same day. DCS devised action steps that Mother agreed to complete to avoid the Child's return to foster care. These action steps included permitting DCS random home visits, continuing mental health treatment, submitting to drug screens, and weekly providing DCS her work schedule. A week later, it was revealed that Mother was allowing Father unsupervised visitation with the Child, thus placing both parents in violation of the court's order for trial home placement. Additionally, Mother denied DCS access to both the home and Child, refused to comply with random drug screens, and did not submit her work schedule. On DCS's recommendation, the court terminated the trial home visit by order entered April 9, 2018. Mother then refused Ms. Turner's request to bring the Child to the DCS office, so Ms. Turner and the police drove to Mother's apartment to retrieve the Child. Upon seeing them, Mother sped away with the Child in the car before the police apprehended her two miles down the road. Following a hearing on April 11, 2018, the court ordered Mother "to attend an intake appointment with a licensed mental health professional because [she] reported she uses marijuana daily for anxiety and that she has previously been diagnosed with bipolar disorder, borderline personality disorder, and anxiety." The Child was returned to the foster home.

During the months that followed, Mother and Father struggled to meet several of the requirements of the permanency plans. Their visits with the Child decreased significantly. Father did not maintain contact with DCS. Mother and Ms. Turner's relationship became contentious. On December 12, 2018, DCS petitioned the Juvenile Court to terminate Mother's and Father's parental rights. The case proceeded to a final hearing on June 26, 2019. Mother, Father, the foster parent, the Child's maternal grandmother, and Ms. Turner testified.[3] All parties were represented by counsel and a guardian ad litem represented the Child's interests. By order entered August 13, 2019, the trial court granted the petition and terminated Mother's parental rights on the grounds

---

[3] The testimony will be outlined below as relevant to the issues on appeal.

of (1) abandonment by failure to support, (2) abandonment by failure to provide a suitable home, and (3) substantial noncompliance with the permanency plan. The trial court terminated Father's parental rights on the grounds of (1) abandonment by failure to provide a suitable home and (2) substantial noncompliance with the permanency plan. The court found that termination of Mother's and Father's parental rights was in the best interest of the Child. Both parents timely appealed.

## II. ISSUES

We consolidate and restate the issues on appeal as follows:

A.     Whether clear and convincing evidence supports the trial court's finding that Mother abandoned the Child by failure to support.

B.     Whether clear and convincing evidence supports the trial court's finding that Mother and Father abandoned the Child by failure to provide a suitable home.

C.     Whether clear and convincing evidence supports the trial court's finding that Mother and Father were substantially noncompliant with the permanency plans.

D.     Whether clear and convincing evidence supports the trial court's finding that termination was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*,

77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1)    [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2)    [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a factfinder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de

novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W. 3d 662, 680 (Tenn. 2017).

## IV. DISCUSSION

Only Mother appeals the grounds for termination. Both Mother and Father appeal the trial court's finding that termination was in the Child's best interest. Father does not appeal the statutory grounds supporting the trial court's termination decision. In such cases, our Supreme Court offered the following instruction:

> [I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.

*In re Carrington H.*, 483 S.W.3d at 525-26 (internal citation and footnote omitted). Accordingly, we will review the court's findings.

### A.
### *Abandonment by Failure to Support*

Parental rights may be terminated for abandonment, as defined in Tennessee Code Annotated section 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). The statute defines "abandonment," in pertinent part, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a . . . petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights . . . that the parent or parents . . . have failed to support or have failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i). The statute defines "failed to support" or "failed to make reasonable payments toward such child support" as:

> the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were

made during the relevant four-month period[.]

Tenn. Code Ann. § 36-1-102(1)(D).

Since July 1, 2018, a petitioner such as DCS is no longer required to prove willfulness as an element of abandonment by failure to support, but the respondent may assert as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that his or her failure to support was not "willful." Tenn. Code Ann. § 36-1-102(1)(I). Thus, the burden is on Mother to prove by a preponderance of the evidence that her failure to support the Child was not willful. *Id*.; *In re Kolton C*., No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *7 (Tenn. Ct. App. Nov. 26, 2019)

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.]

*In re Audrey S*., 182 S.W.3d at 864 (citations omitted).

DCS filed the petition on December 12, 2018, so the relevant four-month period is August 12, 2018 to December 11, 2018. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (statutory four-month period covers four months preceding day termination petition was filed and does not include day petition was filed). Mother was ordered to pay $10.00 monthly child support and did indeed set up payments through the child support office. However, she only paid $40.00 total, a fact that she does not dispute. The exhibits and Ms. Turner's testimony show that Mother's first payment of child support was on November 28, 2017, and the last on May 15, 2018. Therefore, she paid nothing during the relevant four months. On cross-examination by Mother's counsel, Ms. Turner confirmed that "there has not been a long period of time where [Mother] wasn't employed," although there were times that DCS could not confirm a particular employer. The parties do not dispute that Mother had the capacity and means to pay $10.00 per month for child support.

On appeal, Mother argues that her "testimony at trial clearly evidenced a genuine lack of willfulness on her part." Mother testified that she thought the child support was being deducted from her paychecks because it had been "from the beginning of when this all started." This was her reason for not remitting direct payments to the child support office. She testified that she did not notice that the payments were not being deducted from her paycheck and, anyhow, she would "not notice ten dollars missing out of [her] account." Mother confirmed that she was aware of her duty to pay child support both

- 7 -

from the permanency plan and from the Criteria for Procedures of Parental Rights stating that failure to pay is a ground for termination. Mother admittedly never thought to call the child support office or Ms. Turner to inform them of her multiple job changes nor took any steps to verify that child support was actually being paid. Nor did Mother directly pay child support during periods of time when she lacked a consistent paycheck.

The record reflects that it was Mother's own inactions that caused the Child to be unsupported by her. What she characterizes as a lack of willfulness we recognize as apathy to an important parental responsibility. We find that Mother has failed to establish by a preponderance of the evidence that her failure to pay support for the Child within the four months preceding the filing of the termination petition was not willful. We affirm the trial court's determination that DCS proved by clear and convincing evidence that Mother abandoned the Child by failing to support her within the meaning of Tennessee Code Annotated sections 36-1-113(g)(1), 36-1-102(1)(A)(i), and 36-1-102(1)(D).

B.
*Abandonment by Failure to Provide a Suitable Home*

A parent may be found to have abandoned his or her child by failing to establish a suitable home. Tenn. Code Ann. § 36-1-113(g)(1). This ground for the termination of parental rights is established when:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . .

toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). A "suitable home" means more than adequate "physical space" – it requires that the appropriate care and attention be given to the child as well. *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). This court has determined that a suitable home is one that is free from drugs and domestic violence. *Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). Additionally, matters related to counseling and assessments are "directly related to the establishment and maintenance of a suitable home." *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009).

This ground requires DCS to make reasonable efforts to assist the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii); *In re Kaliyah S.*, 455 S.W.3d 533, 553 n.29, 554 n.31, 555 n.32 (Tenn. 2015). DCS's efforts to assist a parent "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii). "[P]arents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required DCS to remove their children from custody." *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. Sep. 19, 2014) (quoting *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006) overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)).

In this case, following a physical altercation between the parents, the Child was bruised and removed from the home on June 1, 2017. As the trial court noted, originally the parents' conduct, rather than the space itself, rendered the home unsuitable for the Child because both parents were using illicit substances and engaging in violence at home at the time. The Child was adjudicated dependent and neglected in July 2017 and entered DCS custody in August 2017 because her great aunt and uncle could no longer care for her. The parties do not dispute, and we find, that from this point on, DCS made reasonable efforts to help Father and Mother each establish a suitable home. As to Father, these efforts included numerous attempts by Ms. Turner to contact him, assist him, accommodate his work schedule, and visit his residence. DCS was never permitted entry into the home Father lived in at the time of trial and he simply did not maintain contact with DCS. Father visited the Child twice over the nearly twenty-seven months that she was in DCS's custody. In short, the record clearly shows that Father demonstrated a lack of interest, effort, and ability to provide the Child with a suitable home.

As to Mother, DCS's efforts included reviewing and discussing the termination criteria with her, creating two permanency plans with her input, scheduling visitation, scheduling required classes, soliciting the donation of home supplies, and entering a case

service request for a mental health assessment.  Mother made reciprocal efforts at first, enough to be granted a trial home placement with the Child.  After this, Mother stopped following through with her responsibilities, including the action steps.  Even after the court terminated the brief trial home placement, Mother ignored the court's order to schedule a second mental health intake appointment.  The testimony establishes that she attended only seven therapy appointments between May 2018 and the termination hearing date, citing her busy work schedule and her feeling that the therapy was unhelpful.  Mother was dismissed from counseling services and medication management services because of noncompliance.  She stopped taking her medication due to adverse side effects, but against a doctor's advice.  DCS asked Mother to discuss the side effects with her medication management professional, but she did not.  We have previously found that a "Mother's own failure to comply with her mental health treatment regimen demonstrated her lack of concern for the Child[] and resulted in her inability to provide a suitable home environment."  *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *12 (Tenn. Ct. App. Apr. 11, 2018), *perm. app. denied* (July 12, 2018).

Mother also failed drug screens and specifically avoided urine screens altogether.  During a March 2019 hearing, instead of submitting to a court-ordered drug screen, she told the court that she was "tired of all this shit."  On appeal, Mother states that her home is now "safe and clean," just as it was before the termination hearing.[4]  She correctly notes that no evidence establishes that she used marijuana in the Child's presence.  Notwithstanding, we reiterate Ms. Turner's and the trial court's main concern that Mother admittedly uses marijuana "pretty much every day" to self-medicate for aggression, anger, and anxiety.  That fact, coupled with Mother's demonstrated noncompliance with mental health treatment, show that she would not soon be ready to provide a suitable home or environment for the Child.  *See In re M.F.O.*, 2009 WL 1456319 at *5.

We conclude that there is clear and convincing evidence to support the trial court's determination that Father's and Mother's parental rights should be terminated on the ground of abandonment by failure to provide a suitable home.

## C.
### *Substantial Noncompliance with Permanency Plan*

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A).  A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2).  To

---

[4] At the time of the final hearing, Mother and Father were living together again.  They shared a three-bedroom, two-bathroom house with a yard.

- 10 -

establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *Id.* Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49. "Substantial" is defined as "of real worth and importance," *Black's Law Dictionary* (11th ed. 2019), and "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.

Notably, this ground for termination does not require that DCS "expend reasonable efforts to assist a parent in complying with the permanency plan requirements." *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *7 (Tenn. Ct. App. June 21, 2017); *see also In re Kaliyah S.*, 455 S.W.3d at 555 ("[I]n a termination proceeding, the extent of [the Department's] efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

The trial court found that "the requirements of the permanency plan for the parents were reasonably related to the grounds for removal and the goal of the parents' re-unification with their child." At trial, Father testified that he completed only one step of either the first or second permanency plan: attending a domestic violence class. He waited until the trial date to provide proof of completion to DCS. Father also paid child support, and submitted to a random drug screen one week before trial, but failed to complete any other requirements or engage in this case generally. For her part, Mother completed many of the permanency plan steps early in the proceedings, including anger management, nurturing parenting, and domestic violence education. Although Mother was unemployed at the time of the final hearing and was relying on her mother for rides, she mostly maintained employment and reliable transportation after agreeing to the permanency plans.[5] However, as detailed in sections A. and B. above, Mother did not

---

[5] Ms. Turner testified that Mother's employment was inconsistent, lasting only a few weeks at each job, and that some employers could not verify she was on their payroll.

financially support the Child, was uncooperative with drug testing,[6] did not make an effort to receive adequate mental health treatment, was dismissed from counseling for missing too many appointments, and did not cease using marijuana daily. The trial court specifically found that these were "'core' steps central to both the reasons for removal and re-unification of parent and child." We agree. Mother does not argue otherwise. There is clear and convincing evidence in the record to support the trial court's determination that Mother and Father were in substantial noncompliance with the permanency plan and each met the statutory requirements for parental termination on that basis.

## D.
### *Best Interest of the Child*

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination was in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. In making this determination, we are guided by the following non-exhaustive list of factors:

> (i)  In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[7]

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

---

[6] Ms. Turner testified that Mother once threw a drug screen at her.

[7] "[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *In re Kaliyah S.*, 455 S.W.3d at 555.

- 12 -

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

We acknowledge Mother's love for the Child. We also acknowledge that Father paid child support. Tenn. Code Ann. § 36-1-113(i)(9). However, the fact remains that neither parent has made a lasting adjustment of circumstances in the years that the Child has been in DCS custody, despite DCS's reasonable efforts to assist. Tenn. Code Ann. § 36-1-113(i)(1), (2). Further, questions remain as to Mother's ability to provide a safe and stable home for the Child as evidenced by her continued daily use of a mind-altering controlled substance to self-medicate for serious diagnosed mental health conditions. Tenn. Code Ann. § 36-1-113(i)(7), (8). Mother was unconcerned with her duty to pay

child support. Tenn. Code Ann. § 36-1-113(i)(9).

At trial, Father did not dispute that he had visited the Child only twice since she was placed in DCS's custody and testified that he did not know basic things about the Child, such as her bedtime, favorite food or show, or what comforts her. Tenn. Code Ann. § 36-1-113(i)(3), (4). The testimony establishes that Mother visited the Child at the beginning of these proceedings, but the visits decreased as time went on. From May 1 to November 29, 2018, Mother visited the Child only five times. She visited the Child the week before trial, nearly six months after the previous visit.[8] Tenn. Code Ann. § 36-1-113(i)(3). Mother explained that she would cancel some visitations with the Child because she "was just too depressed and could not get out of bed" or she "had work" or she "worked too much and was really tired."

We credit the trial court's finding that there has been and could still be a meaningful relationship between Mother and the Child. Tenn. Code Ann. § 36-1-113(i)(4). However, apart from the two-month trial home placement, the Child has lived in a pre-adoptive foster home since August 2017, and is getting along "great," according to the foster parent. The Child should continue permanency and stability in the home of the foster parent, whom she calls "mom." Tenn. Code Ann. § 36-1-113(i)(5).

The evidence in the record does not preponderate against the trial court's factual findings. Based on these facts and the record as a whole, we conclude that clear and convincing evidence supports a finding that termination of Mother's and Father's parental rights is in the Child's best interest. Accordingly, we affirm the trial court.

## V.    CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary and consistent with this Opinion. Costs of the appeal are taxed to the appellants, Ashley P. and Gabriel A., for which execution may issue if necessary.

_____
JOHN W. MCCLARTY, JUDGE

---

[8] Mother walked out of this visit early without a word because she was upset that the Child called her "Ashley." The Child asked Ms. Turner, "why doesn't Ashley want me?"